## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CYNTHIA MICHELLE OLIVER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:17-CV-356-VEH** |
| | ) | |
| **YMCA OF GREATER** | ) | |
| **BIRMINGHAM, STAN LAW, and** | ) | |
| **LANE VINES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

This is a civil action filed by the Plaintiff, Cynthia Michelle Oliver, against the

YMCA of Greater Birmingham (the "YMCA"), Stan Law, and Lane Vines.

(collectively the "Defendants"). Against the YMCA alone, the Complaint sets out the

following claims: age discrimination in violation of both the Age Discrimination in

Employment Act of 1967, 29 U.S.C. §§ 621-634 (the "ADEA") and the Alabama Age

Discrimination in Employment Act, Ala. Code §§ 25-1-20 through 25-1-29 (the

"AADEA") (Count One); "age harassment/hostile work environment" in violation of

the ADEA and AADEA (Count Two); "sex discrimination" in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17 ("Title VII")

(Count Three); "sex harassment/hostile [work] environment" in violation of Title VII

(Count Four); "sexual orientation discrimination" in violation of Title VII (Count Five); "sexual orientation harassment/hostile [work] environment" in violation of Title VII (Count Six); "race discrimination" in violation of Title VII (Count Seven); "sexual orientation harassment/hostile [work] environment" in violation of Title VII (Count Eight); "retaliation" in violation of the ADEA, AADEA, and Title VII (Count Nine); and the Alabama state law claim of "negligent and wanton hiring, training, supervision, and retention" (Count Twelve). Against the YMCA and Vines together, the plaintiff sets out the following Alabama state law claims: "libel and slander" (Count Ten); "defamation" (Count Eleven); "interference with contractual or business relations" (Count Thirteen); and "invasion of privacy" (Count Fourteen). Finally, against all of the Defendants, the Plaintiff sets out the Alabama state law claim of "intentional infliction of emotional distress" (Count Fifteen).[1]

The case comes before the Court on the Defendants' "Motion To Dismiss Counts Ten Through Fifteen of the Complaint" (the "Motion"). (Doc. 13). The Motion is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and generally claims that the "Plaintiff's threadbare, conclusory allegations in support of each cause of action are clearly insufficient to state a claim under applicable law." (Doc. 13 at 2). For the reasons stated herein, the Motion will be **GRANTED in part**

---

[1] Count Fifteen is the only claim which is asserted against Law.

and **DENIED in part**.

## I. STANDARD

Generally, the Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). However, to survive a motion to dismiss brought under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*").

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556) ("*Iqbal*"). That is, the complaint must include enough facts "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation and footnote omitted). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557 (citation omitted).

Once a claim has been stated adequately, however, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563 (citation omitted). Further, when ruling on a motion to dismiss, a court must "take the

factual allegations in the complaint as true and construe them in the light most favorable

to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citing

*Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006)).

## II.     ALLEGATIONS IN THE COMPLAINT

The Complaint alleges, in pertinent part:

21.     Michelle Oliver is a 55-year-old Caucasian female, born on May 30, 1961.

22.     Oliver began her employment in 1985 with YMCA's predecessor company, Sports First, and had accrued a total of thirty-one (31) years of service.

23.     Oliver was District Vice President of the YMCA of Greater Birmingham and Executive Director of the YMCA Mountain Brook branch.

24.     As District Vice President, Oliver was responsible for leading and supervising the Executive Directors of the Hoover, Downtown Birmingham, Hargis, and Alabaster YMCA branches.

25.     As Executive Director of the Mountain Brook branch, Oliver was responsible for overall leadership and operation of the branch, including facility management, membership and financial development, policy implementation, employee staffing, and customer service leadership.

26.     Oliver was a salaried employee and classified as exempt from overtime.

27.     Between 1985 and 2015, Oliver routinely worked between 40-50 hours a week depending on staffing requirements, workload, and the season of the year.

28.     Oliver received exemplary performance reviews, both in her role as District Vice President and as Executive Director of the Mountain Brook branch.

29.     In 2007-2008, Oliver witnessed Defendant Lane Vines frequenting the office of one of her female subordinates.

30.     Defendant Vines did not have any business-related reason to be visiting alone with this employee so frequently, or having private, closed-door meetings.

31.     The employee was Oliver's direct subordinate and a subordinate to Vines.

32.     Oliver reported Vines'[s] conduct to the CEO at the time out of concern that Vines'[s] relationship with the subordinate was inappropriate.

33.     Oliver is unaware as to whether Defendant investigated Vines'[s] conduct or did anything to correct it.

34.     In February 2013, Stan Law (African American) became the YMCA's Chief Executive Officer.

35.     During Law's first year, he had no complaints about Oliver's performance.

36.     Toward the end of 2013, the position of Chief Operating Officer became available.

37.     Oliver was qualified for the position and applied for it.

38.     Law selected Defendant Vines for the position over Oliver, despite Oliver's qualifications of having more managerial and administrative experience.

39.     In the fall of 2015, Oliver complained to Defendant Vines that the

female tennis pro at her facility was making less money than the male tennis pro at the Greystone facility.

40.     The female tennis pro had more seniority with the YMCA than the male tennis pro.

41.     Vines told Oliver that he did not want her to think it was a "male/female issue" but that he would look into it.

42.     To Oliver's knowledge there was no investigation.

43.     Defendants failed to correct the unequal pay.

44.     After becoming CEO, Law sought to change YMCA programs to be more about community outreach than about health and fitness.

45.     The majority of YMCA's funding comes from members and corporate partners who pay membership fees to belong to state-of-the-art fitness facilities.

46.     Law's change negatively impacted the financial success of the YMCA, including Oliver's Mountain Brook branch, because there was less funding to upgrade facilities and equipment.

47.     Defendants, by and through Law, created a policy and preference for diverting funds from predominately Caucasian facilities to more predominantly African American facilities.

48.     Law intentionally made improvements to facilities that have small membership numbers but are primarily African American, whereas he cut funding and improvements to larger facilities that he perceived as predominately Caucasian.

49.     Oliver's Mountain Brook branch had a predominately Caucasian membership due to its predominately Caucasian overall population.

50.     Law referred to Oliver's Mountain Brook branch as a "country

club."

51.    Defendants, by and through Law, denied Oliver improvements to her facility based on her race and the race of most of the members of that facility.

52.    Because the Mountain Brook facility nonetheless required much needed improvements, Oliver sought funding on her own. When she was successful in securing improvements or funding for her facility, Law refused to acknowledge her efforts.

53.    In 2015, although the Mountain Brook branch did not meet budget, Oliver managed to increase the branch's financial performance by $100,000 over 2014.

54.    Law and Vines nonetheless began scrutinizing Oliver's performance.

55.    Defendants did not scrutinize African-American and male Executive Directors, whose branches were performing more poorly than the Mountain Brook branch.

56.    Defendants did not hold the African-American and male Executive Directors to the same high performance standards as Oliver.

57.    Caucasian managers were singled out for minor infractions, whereas African Americans were not.

58.    One African-American Executive Director was investigated for dishonesty and breach of fiduciary duty.

59.    The investigation concluded that the Execute Director was guilty of tampering with employees' payroll.

60.    Law refused to terminate the African-American Executive Director and allowed him to continue in his position.

61.    Law would fraternize with African-American members of management and exclude Caucasian managers.

62.    Law hosted a private party at his home following a national YMCA event that was held in Birmingham, excluding Caucasian members of management.

63.    Defendants applied dress code policies unequally between African Americans and Caucasians.

64.    Caucasians were disciplined or counseled for having exposed tattoos or piercings, whereas African-American employees were not.

65.    Defendants threatened to terminate Oliver if she did not remove her dreadlocks, which she kept in a clean, professional style.

66.    Defendants allowed African Americans to wear dreadlocks without threatening their employment.

67.    Oliver's dress or hairstyle had never been an issue during her previous thirty (30) years of employment.

68.    Oliver complained to [the] YMCA's Human Resources Manager on numerous occasions about her hostile environment.

69.    Defendants failed to investigate or remedy any of Oliver's complaints.

70.    In March 2015, Oliver complained and referenced the dreadlock issue.

71.    The HR manager asked Oliver if she wanted her to initiate a formal investigation into Oliver's complaints, since Oliver had specifically used the word "discrimination."

72.    Oliver thought about the question for a moment and replied, "No," fearing she would lose her job.

73.     The HR Manager failed to reassure Oliver that Defendants would not retaliate against her for making the complaints or having them investigated.

74.     Instead, the HR Manager advised Oliver that she should remove her dreadlocks and stop wearing cargo pants if she did not want to be fired by upper management.

75.     In June 2015, Oliver, who is homosexual, married her partner.

76.     Law and Vines thereafter became even more openly hostile toward Oliver.

77.     Law and Vines made derogatory comments about Oliver's sexual orientation and made the terms and conditions of her employment even more adverse.

78.     Sometime thereafter, Law made the comment that people who are in their jobs for too long become ineffective.

79.     Oliver perceived this as a derogatory age-related comment.

80.     Oliver noticed that Defendants were engaging in a pattern or practice of replacing older Caucasians with younger or African-American individuals.

81.     In early May 2016, Defendants placed Oliver on a 90-day performance improvement plan ("PIP"), claiming that the Mountain Brook branch was performing poorly and not meeting its financial goals.

82.     Oliver's branch was not performing any less satisfactorily than the other branches that had been negatively impacted by the economy and Law's changes in policy.

83.     Defendants removed Oliver's District Vice President responsibilities and ordered her to only perform Mountain Brook

Executive Director duties.

84.     The change was apparent to Oliver's subordinates, who asked Oliver whether she was still their District Vice President.

85.     Law and Vines excluded Oliver from taking part in several meetings directly involving her position as District Vice President.

86.     On one occasion, Defendants asked the only other two (2) District Vice Presidents in the Greater Birmingham area to lead the meeting, completely excluding Oliver from participating.

87.     The exclusion was humiliating and demeaning to Oliver because it was obvious to everyone in attendance (Oliver's colleagues and subordinates) that she was intentionally being excluded from leadership.

88.     Before Defendants placed Oliver on the PIP, Law and Vines had stated on several occasions that the role of an Executive Director was to be an ambassador for the YMCA in the community.

89.     For years Oliver had been an ambassador in the community by having meetings with community leaders, participating in recruitment functions, conducting association meetings, and performing membership and fund-raising activities.

90.     After the PIP, Defendants ordered Oliver to work a minimum of fifty (50) hours per week exclusively at the Mountain Brook branch and limited Oliver's role outside the branch to four (4) hours per week.

91.     Defendants began requiring Oliver to complete time sheets.

92.     On June 9, 2016, Vines reviewed Oliver's time sheet for the previous week.

93.     Oliver had worked almost twelve (12) hours one day due to having a staff meeting at 6:30 p.m. and then taking the guest speaker and Law out for a business dinner afterwards.

94.     Vines noted on Oliver's time sheet that her time after 5:30 p.m. for the staff meeting (held at the Hoover branch) and dinner did not count towards her required fifty (50) hours.

95.     No other male or younger employees in similar positions were scrutinized for the hours they worked at their branches, nor were they required to work excessive hours without receiving credit like Oliver.

96.     During a meeting on July 7, 2016, Oliver learned that a male Executive Director was only in his branch for twenty-three (23) hours the week before whereas Oliver was being required to work fifty (50)-plus hours.

97.     Defendants gave male employees with less experience and seniority preferential treatment with regard to the terms and conditions of their employment.

98.     Also as part of the PIP, Defendants ordered Oliver to recruit thirty (30) campaign volunteers and assimilate them into the organizational structure by the end of July 2016.

99.     Defendants alleged that this was necessary for Oliver to meet her 2016 annual financial goal of $140,000.

100.    Oliver asked Vines if this was the best practice to achieve this goal, since the Mountain Brook branch had raised and collected the most money in 2015, was one of the top branches in 2016, and other facilities had much lower goal percentages for 2016.

101.    Vines refused to discuss or address Oliver's questions.

102.    Oliver then asked whether other facilities that had much lower goals were being made to recruit thirty (30) volunteers, or whether it was just being applied to her.

103.    Vines refused to answer Oliver's questions and ordered her to

focus on her own branch.

104.   The Pelham Family Branch and YMCA Youth Center were not even at 50% of their campaign goals and had not been ordered to recruit thirty (30) campaign volunteers to help raise money for their branches.

105.   One of those Executive Directors was an African American male and the other a Caucasian male, both significantly younger than Oliver.

106.   Vines ordered Oliver to meet with him and the Human Resources Manager every two (2) weeks to report on her progress.

107.   Oliver complied, but expressed concern on several occasions that the PIP was overly vague regarding exactly what was expected of her.

108.   Vines and the Human Resources Manager refused to address Oliver's concerns or offer any guidance as to how Oliver could meet Defendants' expectations.

109.   Prior to the 90-day PIP plan, Oliver had never received any disciplinary action during her thirty-one (31) years of service.

110.   On June 17, 2016, Oliver filed an EEOC charge alleging age, race, sex, and sexual orientation discrimination and harassment.

111.   On July 21, 2016, the YMCA responded to Oliver's EEOC Charge.

112.   Defendants terminated Oliver's employment on October 3, 2016.

113.   Defendants provided Oliver with no reason for her termination.

114.   Vines merely told Oliver, "Effective today we are terminating your employment with the YMCA."

115.   Oliver filed a second charge of retaliation on October 17, 2016.

(Doc. 1 at 5-16, ¶¶21-115).

## III.  ANALYSIS

### A.  <u>Count Ten (Libel and Slander) and Count Eleven (Defamation)</u>

In ruling on a Rule 12(b)(6) motion, the Court must first identify the elements of the cause of action which is being attacked. *See e.g.*, *Iqbal*, 556 U.S. at 675. ("In *Twombly*, . . . the Court found it necessary first to discuss the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim[.]"); *see also*, *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) ("First, we determine what must be pled for each cause of action."); *Houston v. Bayer Healthcare Pharm., Inc.*, 16 F. Supp. 3d 1341, 1344 (N.D. Ala. 2014) ("[T]he second prong of the *Iqbal* test, in which the court determines whether the complaint states a plausible claim for relief, requires by logical necessity some discussion of the elements of the causes of actions alleged."). That being said, "'notice pleading [does] not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim.'" *Lee v. Caterpillar, Inc.*, 496 F. App'x 914, 915 (11th Cir. 2012) (quoting *Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282–83 (11th Cir.2007)). Nevertheless, "'it is still necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Id.* (internal

quotation omitted in original). In construing the allegations in the Complaint, the Court must "'draw on [its] judicial experience and common sense,'" and may draw "'reasonable inference[s]'" from the facts alleged. *Resnick*, 693 F.3d at 1324 (quoting *Iqbal*, 556 U.S. at 678-679).

In Alabama, the elements of a cause of action for defamation[2] are:

> 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 186 (Ala. 2016) (internal quotations and citations omitted). *"A communication is considered defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." See, Harris v. Sch. Annual Pub. Co.*, 466 So. 2d 963, 964 (Ala. 1985) (internal quotations and citations omitted). In the instant case, Counts Ten and Eleven state as follows:

---

[2] The Court treats Counts Ten and Eleven, each of which is brought against both the YMCA and Vines, as one claim for "defamation" since "[t]here are [only] two types of defamation: libel, which involves the use of print media to publish the defamatory comment, and slander, which involves the oral expression of a defamatory comment." *Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386, 390 (Ala. Civ. App. 1999).

## COUNT TEN

## LIBEL AND SLANDER
## AGAINST DEFENDANTS YMCA AND VINES

204.   Oliver adopts and realleges paragraphs 77-79, 91-94 as if fully recited herein.

205.   This is a claim arising under the laws of the State of Alabama prohibiting defamation, and specifically libel and slander, and brought against the YMCA and Vines.

206.   Defendants intentionally subjected Oliver to negative verbal and written publicity through false accusations about her performance that intended to harm her.

207.   Defendant's [sic] unlawful actions proximately caused Oliver to suffer severe emotional distress, physical injury and pain, mental anguish, trauma and embarrassment, financial loss, and the inability to secure employment within her community.

\* \* \*[3]

## COUNT ELEVEN

## DEFAMATION
## AGAINST DEFENDANTS YMCA AND VINES

209.   Oliver adopts and realleges paragraphs 77-79, 91-94 as if fully recited herein.

210.   This is a claim arising under the laws of the State of Alabama prohibiting defamation.

211.   Oliver was subjected to negative publicity with her peers

---

[3] The Court has omitted the *ad damnum* clause from each count.

because of Defendants' false and intentional accusations regarding Oliver's poor performance.

212. Defendants intended to harm Oliver financially, emotionally and physically with their acts of defamation.

213. Such unlawful actions proximately caused Oliver to suffer severe emotional distress, physical injury and pain, mental anguish, trauma and embarrassment, financial loss and the inability to secure employment within her community. Further, Oliver's reputation was tarnished as a result of Defendants acts of defamation.

(Doc. 1 at 31-32, ¶¶204-213).[4] Setting aside for a moment the paragraphs which incorporate previous allegations in the Complaint, the above-quoted language is the classic "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.[5]

Even when one considers the incorporated facts in each count, the Complaint fares no better. The Counts, with their incorporated facts, are shotgun in nature, as they address conduct by the "Defendants," without specifying which Defendant engaged in what conduct. *See*, *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (describing one category of shotgun pleading one where the Complaint asserts multiple claims against multiple defendants without specifying which of the

_____

[4] Although the Plaintiff argues in her brief that she states defamation claims against "all Defendants" (doc. 24 at 3) (section III. A. heading), these Counts, on their face, are brought only against the YMCA and Vines.

[5] All of the Counts which are attacked by the Defendants in this Motion suffer from this same problem.

defendants are responsible for which acts or omissions, and noting that such pleadings "fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests"). Furthermore, the factual allegations which are incorporated fail to state a plausible claim for defamation, which, at the very least, requires a "false and defamatory statement." In the paragraphs incorporated by reference, only the following "statements" appear:

- "Law and Vines made derogatory comments about Oliver's sexual orientation." (Doc. 1 at 12, ¶77).

- "Law made the comment that people who are in their jobs for too long become ineffective." (Doc. 1 at 12, ¶78).

- "Vines noted on Oliver's time sheet that her time after 5:30 p.m. for the staff meeting (held at the Hoover branch) and dinner did not count towards her required fifty (50) hours." (Doc. 1 at 14, ¶94).[6]

Assuming, without deciding, that statements made by Law, against whom these counts are <u>not</u> brought, could somehow be imputed to the YMCA (an argument that was not

---

[6] The Complaint also states that "The HR manager asked Oliver if she wanted her to initiate a formal investigation into Oliver's complaints, since Oliver had specifically used the word 'discrimination.'" (Doc. 1 at 11, ¶71). This is not a false or defamatory statement. It is a question.

made by the Plaintiff)[7], the vague allegation that Law made "derogatory comments about Oliver's sexual orientation" does not plausibly establish that Law said something that was: "false or defamatory," was made to a third party, and caused harm to the Plaintiff.[8] As to the allegation that "Law made the comment that people who are in their jobs for too long become ineffective," even if the YMCA could somehow be held responsible for this comment, it is a statement of opinion, not specifically directed at the Plaintiff, and, on its face is not defamatory. *See*, *Larrimore v. Dubose*, 827 So. 2d 60, 62 (Ala. 2001) (holding that the plaintiff must allege a false statement of fact about her); *see also supra, Harris*, 466 So. 2d at 964 ("A communication is considered defamatory if it tends so to harm the reputation of another as to lower him in the

---

[7] The Complaint also does not explain how the YMCA can be held accountable for any of these statements.

[8] The Plaintiff's allegations that it was "apparent" and "obvious" to her co-workers that she was being excluded from certain duties (*see* doc. 1 at 13, ¶¶84-87) does not support a claim that any Defendant published a false statement about her. Similarly, the Plaintiff also makes the following argument:

> The Complaint alleges that Oliver's peers, subordinates, colleagues, and community were aware of Defendants' treatment, by and through their derogatory comments about her performance, age, race, and/or sexual orientation. (*Id*. at ¶¶ 84, 88-90, 207, 213.) YMCA's Human Resources Manager advised Oliver that she "should remove her dreadlocks and stop wearing cargo pants if she did not want to be fired by upper management," indicating that she was also aware [sic], or part of, Defendants' derogatory comments about Oliver. (*Id*. at ¶ 74.)

(Doc. 24 at 5-6). Again, neither this argument, nor the facts cited in support thereof, point to any false statement made about the Plaintiff.

estimation of the community or to deter third persons from associating or dealing with him."). Too, no facts are alleged which plausibly establish that this comment was made a third party,[9] or that it harmed the Plaintiff in some way.

Vines's alleged comments about the Plaintiff's sexual orientation do not support a claim for defamation for the same reasons Law's did not. Finally, any contention that Vines's notation on Oliver's time sheet was defamatory is ridiculous. There are no facts pled which demonstrate that the notation was false, made to a third party, or damaged the Plaintiff in some way.[10]

In response to the Motion, the Plaintiff also argues, in her brief, that the following conduct supports of her defamation claim:

– Law referred to the Mountain Brook branch as a "country club." (Doc. 24 at 2) (citing doc. 1 at 7, 9, ¶¶34, 50).

– Law denied improvements to the Mountain Brook branch. (Doc. 24 at 3) (citing doc. 1 at 9, ¶51).

---

[9] Assuming it was made to management, "[c]ommunications among the managerial personnel of a corporation about the company's business do not constitute a publication." *Dixon v. Econ. Co.*, 477 So. 2d 353, 354 (Ala. 1985).

[10] The Complaint also generally refers to "false and intentional accusations regarding Oliver's poor performance." (Doc. 1 at 33, ¶ 211). As noted previously, this conclusory allegation fails to set out what was said and by whom. Furthermore, as noted previously, "[c]ommunications among the managerial personnel of a corporation about the company's business do not constitute a publication." *Dixon*, 477 So. 2d at 354.

– The "Defendants" claimed in the PIP that the Mountain Brook branch was performing poorly and not meeting its financial goals. (Doc. 24 at 4) (citing doc. 1 at 12, ¶81).[11]

---

[11] The Plaintiff also argues that her Complaint "states additional facts of defamation." (Doc. 24 at 4) (citing doc. 1 at 32-38, ¶¶206, 211, 227-228, 233-235, 243). The cited portions of the Complaint read:

206.    Defendants intentionally subjected Oliver to negative verbal and written publicity through false accusations about her performance that intended to harm her.

* * *

211.    Oliver was subjected to negative publicity with her peers because of Defendants' false and intentional accusations regarding Oliver's poor performance.

* * *

227.    Defendants intentionally interfered with these business relations in retaliation for Oliver's complaints about Defendants' discrimination and harassment.

228.    Oliver was damaged as a result of Defendants' intentional interference and intent to defame and harass.

* * *

233.    Defendants invaded Oliver's personal and emotional sanctum by harassing, discriminating against Oliver, and falsely accusing and placing her in a false and unfavorable light.

234.    Defendants harassed and discriminated against Oliver, and when she complained, she was placed in a false position and light in the public eye.

235.    Defendants' actions intruded into Oliver's physical solitude and seclusion by having Oliver defend herself against false accusations.

* * *

First, the denial of improvements is not a "statement" at all. Second, the other two statements, on their face, are not defamatory. Calling the Mountain Brook branch a country club is not a statement about the <u>Plaintiff</u>. *See supra*, *Dubose*, 827 So. 2d at 62. Neither was the statement in the PIP.[12] Also, no facts are alleged as to whom each statement was made, or how they damaged the Plaintiff.[13]

The Plaintiff having failed to plausibly allege defamation, Counts Ten and Eleven will be dismissed.

---

> 243.    Defendants' repeated discriminatory remarks of Law and Vines, the disparagement and harassment within the workplace and beyond, the intentional harm to her personal and professional reputation, were done intentionally and with malice.

(Doc. 1 at 32-38, ¶¶206, 211, 227-228, 233-235, 243). The vague and conclusory allegations, some of which have nothing to do with defamation, do not provide factual support for the Plaintiff's claim. They identify no specific statement which was made, fail to distinguish between the conduct of any defendant, and fail to explain to what third party any statement was made.

[12] Even if the statement in the PIP could somehow be considered a statement <u>about the Plaintiff's performance</u> in running the branch, there is no factual allegation as to whom it was made.

[13] The Plaintiff argues that the Defendants improperly rely on cases decided on summary judgment in support of their arguments. (*See* doc. 24 at 5, 6). While the Court is cognizant of the fact that the instant Motion is a motion to dismiss, that does not mean that every statement made in a case deciding a motion for summary judgment is inapplicable. To the extent a case sets out the <u>elements</u> and/or <u>law</u> of defamation in Alabama, it is, and was, properly considered by this Court.

## B.   <u>Count Thirteen (Intentional Interference with Contract or Business Relations)</u>[14]

This count is alleged against the YMCA and Vines. In Alabama, the elements of intentional interference with contract or business relations are: "(1) the existence of a protectible [contract or] business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). Count Thirteen alleges vaguely that "there existed a business relationship between Oliver, her employees, supervisors, other members of management, and clientele." (Doc. 1 at 36, ¶ 225; *see also* doc. 24 at 8-11). This Count fails first because, in her Complaint, the Plaintiff fails to set forth any facts identifying any <u>specific</u> relationship, how the Defendants interfered therewith, and what damage the Plaintiff suffered.[15]

Furthermore, "one of the elements is that the defendant be a *stranger* to the relationship." *White Sands Grp.*, 32 So. 3d at 14. Neither the YMCA, nor Vines is a

---

[14] Although the Plaintiff does allege <u>in her brief</u> that "Law and Vines were not a [sic] 'parties' to Oliver's employment 'contract' with YMCA [sic]" (doc. 24 at 8), there are no factual allegations <u>in the Complaint</u> that the Plaintiff had a "contract" with <u>anyone</u>. Even if she had an employment contract with the YMCA, as shown *infra*, the YMCA could not be liable for interference with a contract to which it was a party. Similarly, Vines, as a "participant" in that contract, could not be liable for interference therewith.

[15] The first paragraph of this court adopts and realleges nearly 100 paragraphs of facts. (*See* doc. 1 at 35, ¶224). This shotgun approach is insufficient.

stranger to the relationship between Oliver and "her employees, supervisors, other members of management, and clientele." *See*, *Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d 1143, 1154 (Ala. 2003), *as modified on denial of reh'g* (Sept. 5, 2003) ("A defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or control over, that relationship.").[16] In Count Thirteen itself, the only relationships identified by the Plaintiff are those with her fellow employees at the YMCA, and her "clientele" who were members of the YMCA.[17]

_____

[16] In her response to the motion, Oliver explains that Vines interfered with Oliver's relationship with the female tennis pro, who she alleges was being paid less than the male tennis pro, by failing to investigate or correct the pay disparity. In addition to Vines not being a stranger to this relationship, Oliver fails to explain how Oliver was damaged by this alleged "interference."

[17] In her brief, Oliver alleges that she had business relationships with the following: the YMCA itself (doc. 24 at 8) (noting that the YMCA refused to promote and discriminated against the Plaintiff, and "Law and Vines were not a [sic] 'parties' to Oliver's employment 'contract' with YMCA [sic][.]"); the female tennis pro who was allegedly paid less than her male counterpart (doc. 24 at 8) ("Defendants tied Oliver's hands in the matter and, thus, interfered with Oliver's business relationship with the female tennis pro at her facility."); members of and corporate partners with her branch (doc. 24 at 8-9) ("Defendants created policies and preferences for diverting funds from predominately-Caucasian facilities with larger membership numbers to predominately African-American facilities with smaller membership numbers . . .which negatively impacted the financial success of the Mountain Brook YMCA."); members of management (doc. 24 at 9) ("Oliver alleges that Law would fraternize with African-American members of management and exclude Caucasian managers . . . arguably affecting [the Plaintiff's] growth within the company and opportunities for advancement."); colleagues and employees of the YMCA (doc. 24 at 9-10) ("Defendants removed Oliver's District Vice President responsibilities and ordered her to only perform Mountain Brook Executive Director duties[,] [a change which was] apparent to Oliver's subordinate Executive Directors, who asked Oliver whether she was still their District Vice President. Law and Vines excluded Oliver from taking part in several meetings directly involving her position as District Vice President."); and community leaders who participated in YMCA membership recruitment functions and fund-raising (doc. 24 at 10) ("After the PIP, Law and Vines limited Oliver's role outside the branch to four (4) hours per week and ordered Oliver to work a minimum of fifty (50) hours per week exclusively at the Mountain Brook branch."). To the extent that the Plaintiff is alleging interference with her relationship with

Neither the YMCA, nor Vines, as its Chief Operating Officer, were strangers to these relationships.[18] *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1303 (11th Cir. 2010) (restaurant owners not a stranger to relationship between customers and servers because "they were involved in creating those relationships; without them the plaintiffs would have had no relationship with the patrons of the restaurant or with their co-workers").[19]

---

the YMCA itself, neither the YMCA (obviously), nor Vines was a stranger to that relationship. All the other relationships to which the Plaintiff refers are actually the YMCA's relationships, to which she is also a party, and/or a participant, by virtue of her employment with the YMCA.

[18] Each was at the very least a "participant" in these relationships. The Alabama Supreme Court has explained that a "participant" in the relationship is not a stranger to it, explaining:

> "For the sake of clarity, we adopt the term 'participant' to describe an individual or entity who is not a party, but who is essential, to the allegedly injured relationship and who cannot be described as a stranger. One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract. In such an instance, the participant is not a stranger to the business relationship and the interwoven contractual arrangements define the participant's rights and duties with respect to the other individuals or entities in the relationship. If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract."

*Walter Energy, Inc. v. Audley Capital Advisors LLP,* 176 So. 3d 821, 829 (Ala. 2015) (*quoting Waddell*, 875 So. 2d at 1157).

[19] In her brief in response to the motion, the Plaintiff argues that Vines interfered with her relationship with the YMCA when he "engaged in a pattern of discrimination and harassment against Oliver." (Doc. 24 at 8). Vines was a participant in that relationship and thus not a stranger to it. *See supra* note 10.

## C. Count Fourteen (Invasion of Privacy)

This count is brought against the YMCA and Vines. Invasion of privacy is: "the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Ex parte Bole*, 103 So. 3d 40, 51–52 (Ala. 2012) (internal quotations and citations omitted).

> It is generally accepted that invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.

*Ex parte Birmingham News, Inc.*, 778 So. 2d 814, 818 (Ala. 2000) (internal quotations and citations omitted). A version of the tort known as "false light" invasion of privacy occurs when

> one gives publicity to a matter concerning another that places the other before the public in a false light, [and] (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Ex parte Bole*, 103 So. 3d at 51–52.

The Complaint and the Plaintiff's brief do not articulate which type of invasion of privacy she asserts. Furthermore, like the previously dismissed counts, this Count

fails because the Plaintiff fails to set forth any facts identifying any specific way in which the Defendants invaded her privacy.[20] Finally, if this is a false light claim, no facts are alleged which plausibly demonstrate that the Defendants published false information to third parties.[21] Count Fourteen is due to be dismissed.[22]

---

[20] In her Complaint, the Plaintiff continues to shotgun facts through adoption and incorporation. (*See*, doc. 1 at 37, ¶231). In her brief she also vaguely writes:

> Oliver alleges detailed facts describing how Defendants targeted her personally and professionally, engaging in an ongoing pattern of unlawful, degrading discrimination and harassment; how Defendants further targeted Oliver with retaliation, leading to her termination, after she complained; how Defendants published false and negative statements about Oliver personally and professionally that placed Oliver in a negative light with colleagues, subordinates, clients, and the community; and how Oliver is being forced to defend herself in a public forum against Defendants' unlawful acts. (Doc. 1, ¶¶ 231-235.)

(Doc. 24 at 12).

[21] The Plaintiff argues that no "communication" or "publication" is necessary for the tort to be actionable. (Doc. 24 at 12-13). This statement is patently untrue for a "false light" claim which requires the Defendants to have given "publicity to a matter concerning another that places the other <u>before the public</u> in a false light." *Ex parte Bole*, 103 So. 3d at 51–52 (emphasis added); *see also*, *Butler v. Town of Argo*, 871 So. 2d 1, 12 (Ala. 2003) ("[I]t is integral to a false-light claim that the untrue information be publicly communicated.").

[22] The Plaintiff cites to this Court's opinion in *White v. Vivier Pharma Corp.*, No. 2:12-CV-205-VEH, 2012 WL 1424916, at *3 (N.D. Ala. Apr. 19, 2012) (Hopkins, J.) for the proposition that the Motion should not be granted on "an underdeveloped record," when relying on cases not decided in the context of a ruling on a motion to dismiss. (*See* doc. 24 at 11). Importantly, in *White* this Court concluded that the defendant, as the movant, had not carried its burden "to persuade this court that the facts asserted . . . do not plausibly support an invasion of privacy claim under Alabama law." *White*, 2012 WL 1424916, at *3. Although in *White* this Court did not set out which facts were pled, <u>sufficient</u> facts were pled.

**D.**　　**Count Fifteen (Intentional Infliction of Emotional Distress)**

This Count is alleged against all Defendants. The Alabama Supreme Court has

stated:

> This Court, in 1980, recognized the tort of intentional infliction of emotional distress, or the tort of outrage, and defined the parameters for such an action:
>
> > "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement [ (Second ) of Torts ], supra, at 78 [ (1948) ]. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72."

*American Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980). Furthermore, this Court explained:

> > "It should also be noted that this tort does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' Comment, Restatement, supra, at 73. The principle applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress."

*American Road Serv. Co.*, 394 So.2d at 364–65.

Thus, in order to prevail on her tort-of-outrage claim, [the Plaintiff is] required to present substantial evidence indicating that [the Defendants'] conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1043 (Ala.1993).

*Harrelson v. R.J.*, 882 So. 2d 317, 321–22 (Ala.. 2003). The Alabama Supreme Court has also stated:

The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133 (Ala.1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So.2d 322 (Ala.1989).

*Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011). "That is not to say, however, that the tort of outrage is viable in only [those] three circumstances . . .." *Little v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011) (noting that outrage judgment had been affirmed "against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction."). "[T]he tort of outrage is viable only when the conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Little*, 72 So.

3d at 1173.

Like the other counts discussed herein, no specific facts are set out in the body of Count Fifteen at all. Again, as with the other counts, Count Fifteen "adopts and realleges paragraphs 21-115" in the same shotgun manner. (*See* doc. 1 at 38, ¶238). In her brief, the Plaintiff vaguely discusses how her Complaint "includes numerous, detailed facts," without bothering to set them out. (Doc. 24 at 13).[23] For these reasons alone, Count Fifteen is due to be dismissed.

Furthermore, even if the Court considers <u>all</u> of the facts set out in the Complaint, the allegations contained therein do not set forth "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So.2d at 365. This Court, citing Judge Steele of the Southern District, has written:

> "[T]he line of demarcation between non-actionable outrage claims and actionable outrage claims in the employment arena is found in the determination of whether the termination is for reasons that contravene public policy. Where a plaintiff complains that her discharge contravenes public policy, particularly if the discharge was the culmination of a protracted pattern of discrimination in violation of public policy, she may properly pursue a claim of outrage because the violation of public policy furnishes the requisite 'sound of fury' to accompany the termination. [*Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003)] (outrage claim not cognizable if termination is "not for a reason which

---

[23] Her citation is merely to "(Doc. 1)," a 41 page Complaint containing 245 numbered paragraphs.

contravenes public policy," and if termination was not accompanied with "sound of fury") (*quoting* [*Harrell v. Reynolds Metals Co.*, 495 So. 2d 1381, 1387 (Ala. 1986)]); *see also Wyatt v. BellSouth, Inc.*, 998 F.Supp. 1303, 1312 (M.D.Ala.1998) (under Alabama law, 'the discharge of an employee rises to the level of the tort of outrage only if the discharge violates public policy'). Alabama courts have construed this standard to authorize outrage claims where a plaintiff is complaining about discrimination in retaliation for exercising the fundamental right to marry, or about intrusion on her federally protected right to be free from gender discrimination. *See Rice v. United Ins. Co. of America*, 465 So.2d 1100, 1102 (Ala.1984) (trial court erred in dismissing outrage claim where pregnant employee claimed employer discriminated because of her pregnancy by engaging in a pattern of conduct over a period of several months aimed at forcing her to leave her job, thereby violating plaintiff's federally protected right to be free from discrimination based on sex); *Cunningham v. Dabbs*, 703 So.2d 979, 983 (Ala.Civ.App.1997) (finding jury question on outrage claim where plaintiff did not claim wrongful discharge of at-will employee, but instead alleged a pattern of harassment and a termination of employment in violation of her fundamental right to marry).

*Powell v. Harsco Metal*, No. 2:12-CV-4080-VEH, 2013 WL 3242759, at *9–10 (N.D. Ala. June 20, 2013) (Hopkins, J.) (quoting *Lees v. Sea Breeze Health Care Ctr., Inc.*, 391 F.Supp.2d 1103, 1108 (S.D.Ala.2005) (Steele, J.)).

Count Fifteen does not allege, even conclusorily, that the conduct in which the Defendants allegedly engaged in violated public policy. In her brief, the best the Plaintiff can do is to vaguely state that "considering the role of the YMCA in the community, Defendants' conduct arguably violates public policy." (Doc. 24 at 14). This argument, which should not be confused with an actual allegation in the Complaint,

fails to explain the YMCA's "role in the community," and what public policy was

violated. Count Fifteen is due to be dismissed.

### E. Count Twelve (Negligent and Wanton Hiring, Training, Supervision, and Retention)

This Count is brought only against the YMCA. The Defendants argue that this

claim must fail, because

> Under Alabama law, a party alleging negligent hiring, supervision, training, and retention must prove the underlying wrongful conduct of employees. *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003). Moreover, the underlying conduct must constitute a common law Alabama tort committed by the employee and not a federal cause of action, such as Title VII. *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F.Supp.2d 1314, 1320 (N.D. Ala. 2002).

(Doc. 13 at 15). Since all of the tort claims are due to be dismissed, the argument goes,

this claim too must be dismissed. However, the Plaintiff notes that "Oliver's AADEA

claim alone, which Defendants do not seek to dismiss, additionally supports her

negligence claims." (Doc. 24 at 15-16) (*citing King v. CVS Caremark Corp.*, 2 F.

Supp. 3d 1252 (N.D. Ala. 2014) (Hopkins, J.). In *King*, this Court wrote:

> Defendants do cite to *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F.Supp.2d 1314 (N.D.Ala.2002), which holds that a negligent supervision, retention, and training claim cannot be premised upon underlying sex discrimination. *See id.* at 1320 ("As Alabama does not recognize a common-law tort for sex discrimination in employment, the Court finds that Plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon conduct that is employment discrimination, but does not support a common-law tort.")

(footnote omitted). However, *Thrasher* is not binding on this court and in any event is significantly distinguishable because, in sharp contrast to sex discrimination, Alabama does have a state statute which prohibits age discrimination.

*King*, 2 F. Supp. 3d at 1269. The Defendants do not address this Court's holding in *King*, nor do they explain why any of the other counts in the Complaint could not provide a basis for the negligent hiring claim in Count Twelve.[24] Accordingly, the Motion will be denied as to Count Twelve.

## IV.    CONCLUSION

For the reasons stated herein, it is hereby **ORDERED, ADJUDGED**, and **DECREED** that the Defendants' Motion To Dismiss is **GRANTED** as to Counts Ten, Eleven, Thirteen, Fourteen, and Fifteen. Those Counts are **DISMISSED with prejudice**. In all other respects, the Motion is **DENIED**.

---

[24] In their reply brief, the Defendants "reassert," without discussion, their argument from their initial brief, and add:

> The YMCA further notes that Plaintiff has failed to allege sufficient facts to indicate that the YMCA was on notice of prior behavior by Law or Vines that would constitute a violation of the Alabama Age Discrimination in Employment Act so that the YMCA could be liable for negligence. *See Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 667 (Ala. 2001)(standard for negligent supervision)(citations omitted).

(Doc. 25 at 10). The Court will not consider this additional argument, which is underdeveloped, and was raised by the Defendants for the first time in their reply brief. *See, Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (arguments raised for the first time in a reply brief are not properly before a reviewing court).

**DONE** and **ORDERED** this 28th day of November, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge